**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 22-1788**

———————————

KEWON ENGLISH,

        Plaintiff – Appellant,

and

EARL POWELL,

        Plaintiff,

v.

JOSEPH CLARKE; LEON LOTT, in his official capacity as Sheriff of Richland County; RICHLAND COUNTY SHERIFF'S DEPARTMENT,

        Defendants – Appellees.

———————————

**No. 22-1817**

———————————

EARL POWELL,

        Plaintiff – Appellee,

and

KEWON ENGLISH,

        Plaintiff,

v.

JOSEPH CLARKE; LEON LOTT, in his official capacity as Sheriff of Richland County; RICHLAND COUNTY SHERIFF'S DEPARTMENT,

        Defendants – Appellants.

―――――――――――

Appeals from the United States District Court for the District of South Carolina at Columbia.  J. Michelle Childs, District Judge.  (3:19−cv−02491−JMC; 3:19−cv−02491−SAL)

―――――――――――

Argued: October 26, 2023                        Decided: January 5, 2024

―――――――――――

Before DIAZ, Chief Judge, and WILKINSON and HEYTENS, Circuit Judges.

―――――――――――

No. 22-1788 affirmed and No. 22-1817 dismissed by published opinion. Judge Wilkinson wrote the opinion, in which Chief Judge Diaz and Judge Heytens joined.

―――――――――――

**ARGUED:** James Andrew Bradshaw, WHITE DAVIS AND WHITE LAW FIRM, Anderson, South Carolina, for Appellant/Cross-Appellee.  Andrew Lindemann, LINDEMANN LAW FIRM, P.A., Columbia, South Carolina, for Appellees/Cross-Appellants. **ON BRIEF:** Kyle J. White, WHITE DAVIS AND WHITE LAW FIRM, Anderson, South Carolina; J. Andrew Delaney, WILLIAMS AND WILLIAMS, Orangeburg, South Carolina, for Appellant/Cross-Appellee.  Robert D. Garfield, Steven R. Spreeuwers, CROWE LAFAVE GARFIELD & BAGLEY, LLC, Columbia, South Carolina, for Appellees/Cross-Appellants.

―――――――――――

WILKINSON, Circuit Judge:

Kewon English and Earl Powell were arrested for sexual assault and burglary and detained for over a year before their cases were *nolle prossed* and they were released. They filed suit, alleging that the investigator who interrogated them in connection with the charges, Senior Investigator Joseph Clarke of the Richland County Sheriff's Department, had coerced them into signing false confessions. That coercion, and the arrests and imprisonments that followed it, they argued, violated their constitutional rights under the First, Fourth, Fifth, Sixth, and Fourteenth Amendments. They sued Clarke, Sheriff Leon Lott, and the Richland County Sheriff's Department for damages under § 1983.

The defendants moved for summary judgment, and the district court granted their motion on all of English's claims and on all of Powell's claims except for a malicious prosecution claim against Clarke. Powell's malicious prosecution claim, the district court said, could proceed to trial because it turned on a disputed question of fact—namely, whether the confessions were indeed coerced. English has appealed the grant of summary judgment as to his claims, and Clarke has cross-appealed the denial of summary judgment as to Powell's remaining claim.

For the following reasons, we affirm the grant of summary judgment on English's claims and dismiss Clarke's cross-appeal, thereby returning the case to the district court for further proceedings consistent with this opinion.

I.

A.

3

This appeal concerns Clarke's investigation of a sexual assault and robbery that took place on August 5, 2015. At the core of this case is whether Clarke had probable cause to believe that English and Powell were the perpetrators. Because probable cause is assessed based on "facts within the knowledge" of the investigating officer, *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998), we focus extensively on the investigation, with special emphasis on facts known to Clarke prior to English's arrest.

1.

This case began with an early morning 911 call on August 5, 2015. The woman on the line told the 911 operator that a neighbor had shown up on her doorstep crying, bleeding, and wearing only a torn bra. The woman relayed that the neighbor said she had just been sexually assaulted.

The first officer to respond was Deputy Michael Leahy. According to Deputy Leahy's report, he arrived at the scene just before 6 a.m. and found the victim crying and covered only by a towel. The victim told Deputy Leahy that she had been asleep on her couch when she was shaken awake by two men. She said the men had come in through her sliding glass door, which she had left unlocked because her oldest son had been out and did not have a key. The men forced her to take off her clothing and began to have sex with her. One of the men hit her in the head with a gun. The victim also reported that the men stole her car keys and two money orders totaling $470. She said they had threatened to kill her if she did not stop crying or if she told the police.

The victim reported that her living room was "pitch black" during the incident and that it was difficult to see her assailants, but that one of the men had let slip that she knew

4

him. J.A. 351. He mentioned that he lived in the nearby Beatty Downs subdivision and that the victim knew his mom, "T." The victim identified this man as "Kewon." She told Deputy Leahy that she knew Kewon because he was friends with her son.

After the interview with Deputy Leahy, the victim was taken to the hospital, where she was given treatment and interviewed by a forensic nurse. The nurse's report closely tracked Deputy Leahy's. The victim reported to the nurse that two men had sexually assaulted her and hit her in the head with a gun. She referred to one of the men as "Kewon" (spelled "Kiwan" in the nurse's report) and the other as "the short guy." J.A. 1619. And she mentioned that a money order had been taken from her pocketbook.

The nurse's report, however, contained more detail than Detective Leahy's. In it, the victim recounted that the two men had asked her where they could cash the money order. She told them that she thought Bi-Lo, a local grocery store, could do it. After that, the victim reported, "Kewon" asked whether she would drop him off at the Bi-Lo, and told her that he would leave $250 for her by the air conditioning unit after he cashed the money order.

By this point, Clarke had arrived at the hospital, where he was briefed on the information that had been obtained by medical staff and other officers. By the time Clarke spoke with the victim, he already had a "rudimentary understanding" of her version of the morning's events. J.A. 300. According to Clarke, at the start of his interview, he relayed to the victim what he had been told "concerning a subject named Kewon" and the victim confirmed that she was "certain he was one of the men." J.A. 1657. She repeated many of the details that she had told others: That two men had woken her up and forced her to have

5

sex with them. That at least one of the men had a gun. That they had taken money orders from her pocketbook, but that one of the men had promised to return $250 and put it by her air conditioning unit. That it was dark at the time and difficult to see. That she thought one of the men was Kewon. When asked by Clarke why she thought it was Kewon, she answered, "I am not sure, but that is what he said his name was." J.A. 309. She also reported that he had mentioned his mother, "T.," and the subdivision Beatty Downs.

Meanwhile, several other law enforcement officers had assembled at the crime scene. Some investigators entered the victim's apartment to search for evidence, taking fingerprints and swabbing for DNA. Another investigator took a statement from the neighbor who had called 911. She reported that she had never met the victim before that morning. She also recounted her recollection of what the victim had told her. Her report largely matched those of Clarke, the nurse, and Deputy Leahy, although some of the details were not quite the same. Her account recalled that the victim had said the following: That two men had entered through the victim's open patio door and raped her. That one of the men said his name was "Kewon" (spelled "Kewuan" in the neighbor's report). That the men had taken a money order worth $470 and asked if she would drop them off behind the Bi-Lo. That the guys left $200 so she could pay for her air conditioning. And that the victim had mentioned something about "Beatty Downs Road." J.A. 306.

By 10 a.m., law enforcement had come to suspect that "Kewon" was appellant Kewon English. Sixteen-year-old English was on probation at the time and known to another investigator in the Department. He was also friends with the victim's son, Darrionne. In an interview with an investigator on the scene, Darrionne had said that he

6

had stayed at English's house the night before and had just come from there. Darrionne mentioned that there was a third man at English's house that night, whose name was Earl but who went by the nickname "Smooth." Police later identified "Smooth" as cross-appellee Earl Powell.

Clarke also spoke with Darrionne later in the day and had him sign a statement with his account of the evening. Darrionne's statement indicated that when he went to sleep at 11 p.m., English and Powell were still at English's house in Beatty Downs, but that they were gone when he woke up at around 7 a.m. that morning.

2.

Armed with the information above, Clarke and a fellow investigator drove to English's house. They spoke with English and his mother, Latonya "Tonya" Murphy, on their front porch.

The conversation ended with English accompanying Clarke to the station, but the parties dispute how that came to pass. Clarke asserts that English's mother agreed that English could go with the officers to the station for questioning. English, on the other hand, claims that Clarke instructed him to get in the car and told English's mother she could not go with them because English was under arrest.

The parties also disagree about what happened once they reached the station. Clarke claims that he and his fellow investigator interviewed English and that, after the interview, English provided a voluntary written statement admitting he entered the victim's house uninvited. According to the statement, English himself neither sexually assaulted the victim nor hit her with a gun. Instead, the statement implicated Powell as the lone assailant. After

7

English had signed the statement, Clarke placed him under arrest for burglary and criminal sexual conduct. Clarke claims that it was only at this point that he handcuffed English.

English, on the other hand, claims that he was handcuffed from the moment he arrived at the station—first to a bench and then, when the officers came to take him to the interrogation room, with his hands behind his back and his feet shackled. According to English, Clarke told English to sit down in the interrogation room, but when English went to do so, Clarke pulled out the chair and caused English to fall to the ground. English claims that he repeatedly asked to speak with either his mother or an attorney, but that he was repeatedly denied the opportunity to do so. He recalls that the interrogation lasted for hours.

English also claims that his signed statement was not so voluntary and was, in fact, entirely fabricated by Clarke. He denies confessing to anything. To the contrary, he states that he consistently denied wrongdoing throughout the interrogation. According to English, Clarke prepared the written statement without his input and told him that he could only go home if he signed it. English further asserts that he signed the statement without reading it, that he never said any of the things that were written in it, and that he first learned of its contents when provided a copy in connection with his criminal case.

What is undisputed is that, by the end of the interrogation, English was under arrest. And Clarke was in possession of a written statement, signed by English, that implicated both he and Powell in the morning's crimes.

### 3.

That same evening, Clarke secured a warrant for Powell's arrest based on English's alleged confession. Powell was arrested at his home and taken to the station at around

8

11 p.m. Like English, Powell claims that he was handcuffed to a chair upon arriving at the station. According to Powell, he was then interrogated "for several hours," during which he denied knowing anything about the assault. J.A. 1675. Powell further claims that he was not given anything to drink during the multi-hour interrogation and that he begged to go home. The officers, Powell states, said that he could go home only if he signed a statement admitting to the crimes. Powell claims that, at this point, he asked for an attorney but was told he could not have one. He says he was so physically and mentally exhausted by the end of the interrogation that he signed the statement without reading it in the hope that he would be allowed to go home.

Clarke tells a different story. He claims that after an interview lasting just forty-five minutes, Powell gave a voluntary written statement admitting to the crimes. According to Clarke, he did not coerce or pressure Powell during the course of their interview, and at no time did Powell (or English) request an attorney.

Undisputedly, though, Powell's interrogation, like English's, ended with Powell arrested and Clarke in possession of a signed confession.

### 4.

English and Powell were each detained for more than three hundred days. They were arrested on August 5, 2015, and indicted by a grand jury on November 10, 2015.

Eight months after their arrest (and five months after their indictment), in April 2016, DNA test results became available from the evidence collected from the victim and her apartment. Those results matched neither English nor Powell, but a third man. Clarke swore out a warrant for that third man's arrest that same day. An affidavit from English's

public defender asserted that, by that point, Clarke knew police had made a mistake: that Clarke told the public defender at a restaurant that "he thought Mr. English was innocent" but that he hoped that opinion would "stay between" him and the public defender. J.A. 102. The public defender also stated that he repeatedly asked Clarke and the prosecutor to drop the charges. English was granted bond and released in June 2016, and Powell was granted bond and released in September 2016. But their prosecutions continued to go forward.

Seven more months went by before the charges against English and Powell were *nolle prossed* on December 21, 2016, on the basis that, according to the prosecutor, "insufficient evidence existed to meet the standard of proof" required at a criminal trial. J.A. 354.

B.

English and Powell filed this § 1983 action against Clarke, Sheriff Lott, and the Richland County Sheriff's Department on September 3, 2019, alleging that the defendants had violated their First, Fourth, Fifth, Sixth, and Fourteenth Amendment rights. After discovery, the defendants moved for summary judgment on all claims.

At the outset, the district court granted summary judgment for Sheriff Lott and the Department on all counts, holding that they were arms of the state of South Carolina and thus immune from § 1983 damages suits.

The district court then dismissed all of Powell's claims other than a Fourth Amendment claim for malicious prosecution. It held that the claims it dismissed had accrued at the time of Powell's arrest and were thus barred by the three-year statute of limitations. Unlike English, who was a minor at the time of the arrests, Powell was nineteen

10

years old so his claims were not tolled. The sole exception was Powell's malicious prosecution claim under the Fourth Amendment, which accrued not when Powell was arrested but when he was released.

The district court then turned to the merits of the remaining claims against Clarke. The district court granted summary judgment for Clarke on both of English's Fourth Amendment claims but denied it with respect to Powell's malicious prosecution claim. English's claims were not permitted to go forward because, even excluding the allegedly coerced confession, the court held that there was probable cause to arrest and prosecute English based on the victim's identifications. But Powell had never been identified by the victim, so the only pieces of evidence that formed the basis of probable cause as to him were his and English's confessions. Powell's malicious prosecution claim, therefore, depended on whether Clarke fabricated and coerced those confessions, a question of fact to be decided at trial.

The district court also granted summary judgment on English's First and Fourteenth Amendment claims. As to the First Amendment claim, the court held that the defendants were entitled to qualified immunity because a First Amendment right to be free from state compelled speech had not been clearly established in the context of a coerced confession. As to the Fourteenth Amendment claims, the court held that there was not sufficient evidence to make out an equal protection claim for selective prosecution and that Clarke's actions did not shock the conscience.

English and Powell abandoned their Fifth and Sixth Amendment claims during summary judgment, thus rendering unnecessary any discussion of their procedural history.

11

C.

English timely appealed the grant of summary judgment as to his First, Fourth, and Fourteenth Amendment claims, arguing that the district court should have let them go to trial with Powell's malicious prosecution claim. Clarke cross-appealed, arguing that the district court should have granted him qualified immunity as to Powell's malicious prosecution claim and disposed of it alongside the others. Powell then filed a motion to dismiss the cross-appeal, arguing that the district court's summary judgment ruling was not eligible for interlocutory review because it turned on a disputed question of fact. We consider English's appeal first before turning to Clarke's cross-appeal and Powell's motion to dismiss it.

II.

On appeal, English argues that the district court erred when it granted the defendants summary judgment as to his First, Fourth, and Fourteenth Amendment claims. "We review de novo a district court's decision to grant summary judgment, applying the same legal standards as the district court and viewing all facts and reasonable inferences in the light most favorable to the nonmoving party." *Ballengee v. CBS Broad., Inc.*, 968 F.3d 344, 349 (4th Cir. 2020). Summary judgment is proper only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

We reject English's claims and affirm the district court's grant of summary judgment in favor of the defendants as to each. We in no way underestimate the serious deprivation English suffered here, but we cannot fault officers who proceed to perform

12

their own solemn duties reasonably. Clarke is entitled to summary judgment on English's Fourth Amendment claims because there was probable cause to arrest and prosecute English based on the victim's identifications. English's other claims against Clarke fare no better. His First Amendment claim is unsupported by the law, and his Fourteenth Amendment claims are unsupported by the record. Given that English has not made out a constitutional claim against Clarke, the alleged perpetrator here, there is no issue of triable fact as to liability for Sheriff Lott or the Department. We thus fully affirm the district court with respect to English's case.

## A.

English makes two Fourth Amendment claims: one for false arrest and one for malicious prosecution. Both claims require English to prove he was seized without probable cause. *See Gray*, 137 F.3d at 769; *Evans v. Chalmers*, 703 F.3d 636, 647 (2012).

### 1.

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. To establish a § 1983 claim based on a Fourth Amendment violation for false arrest, English must show that he was seized by Clarke without probable cause. *See Massey v. Ojaniit*, 759 F.3d 343, 356 (4th Cir. 2014).

He can make no such showing. Even excluding English's allegedly coerced confession, Clarke had probable cause to arrest English on August 5, 2015. An officer has probable cause to justify an arrest when "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense."

13

*Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). Probable cause requires more than a "bare suspicion" but less than the evidence necessary to convict. *Gray*, 137 F.3d at 769. "It is an objective standard of probability that reasonable and prudent persons apply in everyday life." *Id.*

We hold that Clarke was amply justified in believing that English had committed burglary and sexual assault that morning based on the victim's repeated identification of English as one of her assailants. A victim's "reliable identification of [her] attacker" almost always suffices to establish probable cause. *See Torchinsky v. Siwinski*, 942 F.2d 257, 262 (4th Cir. 1991); *see also Jenkins v. Keating*, 147 F.3d 577, 585 (7th Cir. 1998); *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999). In fact, "it is difficult to imagine how a police officer could obtain better evidence of probable cause than an identification by name of assailants provided by a victim, unless, perchance, the officer were to witness the crime himself." *Torchinsky*, 942 F.2d at 262. And when officers reasonably believe that a victim's identification is accurate, they "cannot be held liable for a violation of the Constitution merely because it later turns out that" it was not. *McKinney v. George*, 726 F.2d 1183, 1187 (7th Cir. 1984).

English argues that the victim's identifications were not reliable enough to establish probable cause. We disagree. The victim's identifications were specific and relatively certain, and there is nothing to suggest that law enforcement should have been on notice that they might be unreliable or untrue.

First, the victim identified English as her attacker to law enforcement and others with enough specificity that the officers could reliably find the right individual. Her

14

identifications were much more specific than the one we faced in *Smith v. Munday*, 848 F.3d 248, 253–54 (4th Cir. 2017). There, an informant had told law enforcement that a black woman named "April Smith" sold him cocaine. *Id.* at 251. In response, an officer searched a database and found three April Smiths in the local county with criminal records, one of whom had prior cocaine-related convictions. *Id.* He applied for a warrant and arrested her on that information alone. *Id.* at 251–52. We held that the arresting officer lacked probable cause for her seizure because the name "April Smith" was not enough to connect the arrestee April Smith to the crime. *Id.* at 254.

Here, in contrast, the victim gave the officers specific information that allowed them to track down the particular individual she meant to identify. She told the officers not only his first name ("Kewon") but also the nickname of his mother ("T.") and the location of his home (Beatty Downs subdivision). She also told the officers that Kewon was friends with her son. That information was specific enough that, when Clarke found a person who fit that description, they had probable cause to believe he was precisely the person they were looking for.

In addition to specifically identifying English, the victim identified him with enough certainty that the officers could reasonably rely upon her assertions. A victim need not be absolutely positive about an identification in order for law enforcement to reasonably rely on it. *See Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 738–39 (7th Cir. 2003); *Massey*, 759 F.3d at 357. English makes much of the fact that the room was dark, but even in a dark room it is possible to recognize someone you know, especially when they tell you their name, their mother's name, and the subdivision in which they live.

15

Nothing in the record suggests that law enforcement should have been on notice that the victim was lying or mistaken. While there are some inconsistencies between her four accounts—Did "Kewon" mention his own name or only that of his mother? Was there one money order or two?—these inconsistencies are minor and understandable given the trauma that the victim recounted experiencing. We have found that officers reasonably relied upon an identification in the face of more variable accounts. *See Torchinsky*, 942 F.2d at 263 (finding reasonable reliance on a victim's identification despite the victim offering varying statements about the source of his injuries).

Finally, we cannot accept English's invitation to hold that the victim's identification was unreliable because she exhibited signs of shock or trauma. It would be wrong to privilege offenders who inflict suffering on their victims by reflexively calling into question those victims' accounts. In this case, the victim's emotional state cuts the other way. The fact that she recounted a consistent story across four interviews even though she was "all over the place" after being sexually assaulted evinces correctness, not falsehood.

In conclusion, Clarke had sufficient probable cause to arrest English based on the victim's identifications before the contested interrogation even began. Nothing about the interrogation would have undermined that probable cause. We hold therefore that English's § 1983 claim for false arrest in violation of the Fourth Amendment fails as a matter of law.

2.

English's malicious prosecution claim also fails. "A malicious prosecution claim under § 1983," like a false arrest claim, "is properly understood as a Fourth Amendment claim for unreasonable seizure." *Evans*, 703 F.3d at 647. The difference is that malicious

16

prosecution covers unconstitutional seizures supported by legal process: "arrest[s] made pursuant to a warrant" and detentions during "the period after legal process issued—e.g., post-indictment or arraignment." *Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 555 (4th Cir. 2017). To succeed on his malicious prosecution claim, English must show that Clarke "(1) caused (2) a seizure of [English] pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in [English's] favor." *Id*.

English alleges that Clarke should be held liable for malicious prosecution because Clarke caused him to be unlawfully detained pursuant to a warrant (and later an indictment) that was secured using deliberately misleading information—namely, the two fabricated confessions. Warrants and indictments usually "conclusively determine[ ] the existence of probable cause," but not when an officer "deliberately supplied misleading information that influenced the [judge's or grand jury's] decision." *Durham v. Horner*, 690 F.3d 183, 189 (4th Cir. 2012).

To begin with, information, even if "misleading," must also be material. *See Massey*, 759 F.3d at 357. To determine whether an alleged misrepresentation was material, we excise the misrepresentation and consider whether there would have been probable cause based on the "corrected" evidence. *See id.*; *see also Miller v. Prince George's County*, 475 F.3d 621, 629 (4th Cir. 2007). Laying the disputes over the confessions to one side, the evidence in this case consists of the victim's repeated identifications of someone whom she knew. As discussed above, those identifications on their own were enough to establish probable cause.

17

English argues, however, that even if the victim's identifications alone might have provided probable cause at the time of his indictment, that was not the case once the DNA test results exonerated him. But even assuming that probable cause was negated, Clarke cannot be held responsible for English's continued detention. By that point the case was in the lap of the prosecutor. Once the prosecutor's office has taken control of a case, law enforcement officers are generally not responsible for the prosecutor's decisions going forward unless the officer has withheld substantial evidence, *see Humbert*, 866 F.3d at 561, or "lied to or misled the prosecutor," *Massey*, 759 F.3d at 357.

There is no contention that Clarke withheld the DNA evidence from the prosecutor. In fact, the evidence suggests that the prosecutor told Clarke about the DNA results. Nor is there any evidence that Clarke sought to steer or justify the detention after English's case had been handed over to the prosecutor's office. It was the prosecutor, not Clarke, who caused English's continued detention post–DNA evidence. Causation is an essential element of a malicious prosecution claim. We agree with the district court that any causation here is too attenuated and that Clarke was entitled to summary judgment.

### B.

We turn next to English's First Amendment claim. He insists that coerced confessions are compelled speech violative of the First Amendment. But English has pointed to no court that has taken this view, and we decline to become the first. We think it advantageous to keep each constitutional claim on its own track. Coerced confessions generally provide the basis for a Fifth Amendment claim if the confession was proffered

18

for use at a criminal trial. The proper remedy for a coerced confession is suppression of the confession, not a separate First Amendment suit.

C.

English also argues that he has made out a case under the Fourteenth Amendment. First, he claims that Clarke violated his right to equal protection under the law because his prosecution was motivated by a discriminatory purpose and had a discriminatory effect. Second, he asserts that Clarke violated his due process rights by engaging in conduct that shocks the conscience. We agree with the district court that neither of these claims holds water and therefore affirm as to those counts as well.

First, there is no issue of triable fact as to English's equal protection claim. "[T]he Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996). But to make out such a claim, English must show both that "he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).

English has shown neither. He has not attempted to identify any better-treated individuals similarly situated to him, nor has he brought to the court any evidence suggesting such individuals might exist. *See United States v. Armstrong*, 517 U.S. 456, 467 (1996); *see also United States v. Hayes*, 236 F.3d 891, 895–96 (4th Cir. 2001). Moreover, the evidence that English marshals in support of his contention that the officers arrested him because of intentional discrimination cannot support such an inference. There is simply no basis for any claim that Clarke targeted English because of animus. Indeed, all evidence

19

is to the contrary: that English was fingered for the crime because he was identified by the victim as having committed it.

English's due process contentions are just as tenuous. Coercive interrogations can violate the due process clause, but only if the methods employed were "so brutal and so offensive to human dignity that they shock the conscience." *Chavez v. Martinez*, 538 U.S. 760, 773 (2003). Even if we credit entirely English's account of Clarke's interrogation, none of the methods alleged—the handcuffs and leg shackles, the rejection of his request for his mother or an attorney, the kicking out of his chair—shocks the conscience. While such allegations may form the basis of a Fifth Amendment infraction and its ensuing suppression consequences, they do not satisfy the materially higher standard of a due process violation. *See County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (limiting due process violations to "only the most egregious official conduct").

Because neither of English's Fourteenth Amendment claims presents an issue of triable fact, we affirm the grant of summary judgment in favor of Clarke on these counts.

D.

Having concluded that Clarke did not commit any constitutional violations, we may dispose of the cases against Sheriff Lott and the Richland County Sheriff's Department as well. To make out a case for departmental liability under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), English must show both that he has suffered a constitutional harm and that the harm was the result of the Department's unconstitutional policy or custom. *Id.* at 690; *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). But as discussed above, none of the harms English suffered were the

result of constitutional violations. And there is no evidence in the record that reveals any unconstitutional policy or custom on the part of the Department.

We therefore affirm the district court's summary judgment ruling as to Sheriff Lott and the Richland County Sheriff's Department as well. This is a case about the conduct of an individual officer, and the rest of the department should be kept out of it. And given that there was no underlying constitutional violation, we need not reach the question of whether those defendants are entitled to Eleventh Amendment immunity. We leave that question for another day.

## III.

We now turn to Clarke's cross-appeal, which concerns the lone claim the district court slated for trial: Powell's malicious prosecution claim. In letting that claim go to trial, the district court held it turned on a question of fact—namely, whether English's and Powell's confessions were, in fact, coerced. Clarke filed this interlocutory cross-appeal, arguing that the district court wrongly denied him qualified immunity when it let the claim go forward. Powell, in response, moved to dismiss the cross-appeal, arguing that qualified immunity here turns on a question of fact and is thus not eligible for interlocutory appeal. We agree that qualified immunity here turns on a question of fact and thus dismiss the cross-appeal for lack of jurisdiction.

## A.

"Because qualified immunity is an immunity from suit rather than a mere defense to liability[,] it is effectively lost if a case is erroneously permitted to go to trial." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Thus, although a district court's order denying

21

summary judgment is generally not immediately appealable, an order denying summary judgment on the basis of qualified immunity is sometimes subject to immediate appellate review under the collateral order doctrine. *Williams v. Strickland*, 917 F.3d 763, 767–68 (4th Cir. 2019).

We have jurisdiction to immediately review a district court's order denying qualified immunity, however, "only to the extent that the court's decision turned on an issue of law." *Cox v. Quinn*, 828 F.3d 227, 235 (4th Cir. 2016). In contrast, if "summary judgment was denied as to a particular claim solely because there is a genuine issue of material fact, that claim is not immediately appealable and we lack jurisdiction to consider it." *Iko v. Shreve*, 535 F.3d 225, 235 (4th Cir. 2008).

## B.

Notwithstanding Clarke's protestations, we hold that the appeal here is heavily factual and unsuitable for interlocutory treatment. The evidence against Powell was considerably thinner than the evidence against English. The victim offered nothing remotely akin to the consistent identifications she offered with respect to English. Apart from the confessions, the only evidence connecting Powell to the crimes was that he was with English the night before. That does not satisfy probable cause.

Take in addition the factual disputes surrounding both confessions, and the factual nature of what is before us becomes even more apparent. While Clarke argues that confessions, even if coerced, can bolster the case for probable cause, the district court held that infirm confessions should not be included in the probable cause calculus. *See Gilliam v. Sealy*, 932 F.3d 216, 234–35 (4th Cir. 2019). Here we are not in any position to sort out

22

the facts and determine whether the confessions are infirm or not. The facts surrounding the confessions are very much in dispute, reinforcing the inappropriateness of accepting this cross-appeal for interlocutory treatment. We have no jurisdiction to make a determination as to qualified immunity when important facts remain unsettled. We therefore dismiss the cross-appeal and return this heavily factual case to the district court for further proceedings consistent with this opinion.

IV.

For the foregoing reasons, we hereby affirm the district court's grant of summary judgment in favor of the defendants as to English, and dismiss the cross-appeal for lack of jurisdiction.

No. 22-1788 *AFFIRMED*;<br>No. 22-1817 *DISMISSED*