**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 25-1312**

———————

INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION
FUND; TERRY NELSON, in his official capacity as a fiduciary,

      Plaintiffs – Appellees,

v.

FLORIDA GLASS OF TAMPA BAY, INC., a dissolved corporation; AMERICAN
PRODUCTS, INC.; AMERICAN PRODUCTS PRODUCTION COMPANY OF
PINELLAS COUNTY, INC.; API COMMERCIAL INSTALLATION, INC., a
dissolved corporation; API COMMERCIAL ARCHITECTURAL PRODUCTS,
INC., a dissolved corporation; CHARLES & THOMAS PROPERTIES, LLC;
MURACO & MULLAN PROPERTIES, INC.; CERACLAD SOUTH, LLC, a
dissolved limited liability company; JCM PROPERTIES, LLC; FENWALL, LLC;
SPECIALTY METALS INSTALLATION, LLC, a dissolved limited liability
company,

      Defendants – Appellants.

———————

Appeal from the United States District Court for the District of Maryland, at Baltimore.
Stephanie A. Gallagher, District Judge. (1:23−cv−00045−SAG)

———————

Argued: December 10, 2025                    Decided: January 26, 2026

———————

Before WILKINSON and WYNN, Circuit Judges, and KEENAN, Senior Circuit Judge.

———————

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Wynn
and Senior Judge Keenan joined.

———————

**ARGUED:** Peter B. Siegal, NORTON ROSE FULBRIGHT US LLP, Dallas, Texas, for Appellants. Brian A. Pepicelli, TUCKER ARENSBERG, PC, Pittsburgh, Pennsylvania, for Appellees. **ON BRIEF:** Joseph E. Simmons, Dallas, Texas, Gregory J. Ossi, NORTON ROSE FULBRIGHT US LLP, Washington, D.C., for Appellants. Neil J. Gregorio, TUCKER ARENSBERG, P.C., Pittsburgh, Pennsylvania, for Appellees.

WILKINSON, Circuit Judge:

Multiemployer pension plans are cooperative endeavors. For any plan to succeed, many employers—sometimes thousands—must share the burden of funding and administering it. Their joint contributions are what enable the plan to provide its beneficiaries the pensions it has promised them.

In this case, an employer is seeking to use a quirk of bankruptcy law to avoid paying what it owes a multiemployer pension plan. While it is true that the pension laws do not operate seamlessly in the bankruptcy context, it is not true that they may be discarded or twisted into a free pass for "opportunistic employers" to evade their obligations. *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 723 (1984) (citation omitted). The law permits the multiemployer plan maximum flexibility, even in the midst of a contributing employer's bankruptcy, to collect what is due.

The district court rejected this employer's maneuvers. Now we do as well. The district court's grants of summary judgment and damages to the pension plan are affirmed.

## I.

We begin by outlining the "comprehensive and reticulated" statutory framework governing this dispute. *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 361 (1980).

## A.

Two statutes are at issue: the Employee Retirement Income Security Act of 1974 (ERISA) and the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA). In ERISA, Congress established a set of basic rules to "protect . . . the interests of participants

3

in employee benefit plans." 29 U.S.C. § 1001(b). "Unfortunately," these rules had the accidental effect of "encourag[ing] an employer to withdraw from a financially shaky plan" rather than "remain and (if others withdrew) risk having to bear alone the entire cost of keeping the shaky plan afloat." *Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 416–17 (1995). In the MPPAA, Congress fixed this problem by imposing a charge on withdrawing employers. Upon withdrawal, each would have to pay its share of the plan's "future vested pension liabilities." *Id.* at 416.

The charge, called "withdrawal liability," is the focus of this suit. 29 U.S.C. § 1381(a). The MPPAA "places the . . . burden" of assessing the charge on the pension plans themselves. *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp.*, 522 U.S. 192, 197 (1997). "When an employer withdraws from a multiemployer plan," the plan must "determine the amount of the employer's withdrawal liability." 29 U.S.C. § 1382. "As soon as practicable," the plan must then "notify the employer" of the amount and a schedule for paying it, and must also "demand payment in accordance with the schedule." *Id.* § 1399(b). If the plan has sufficient reason to be concerned about the employer's financial stability, it may choose to accelerate the payment schedule and "require immediate payment" of the entire amount at once. *Id.* § 1399(c)(5).

In some contexts, determining whether an employer has withdrawn from a plan is straightforward. Not so in the building and construction industry (BCI). Because a BCI employer might contribute to a plan during a construction project and then pause contributions until it commences another project, a cessation of contributions does not, on its own, constitute a withdrawal. *Id.* § 1383(b)(2); *Carpenters Pension Tr. Fund for N. Cal.*

4

*v. Underground Constr. Co.*, 31 F.3d 776, 778 (9th Cir. 1994). Instead, a BCI withdrawal occurs when an employer "ceases to have an obligation to contribute" to the plan under the relevant collective bargaining agreement (due, for example, to the cessation of a project) and then, at some point during the next five years, "continues to perform" or "resumes" the same type of work but no longer has an obligation to contribute. 29 U.S.C. § 1383(b)(2). At that point, its withdrawal is backdated to the moment at which its contribution obligation ceased. *Id.* § 1383(e).

Once an employer has withdrawn from a multiemployer pension plan, and the plan has sent the employer a notice and demand for withdrawal liability, the clock begins ticking on a series of MPPAA dispute resolution procedures. The employer has an initial 90 days to ask the plan to correct inaccuracies or review other issues. *Id.* § 1399(b)(2). Then the parties have another limited window, often 180 days, to initiate arbitration for "[a]ny dispute . . . concerning" the notice and demand. *Id.* § 1401(a)(1). If neither party initiates arbitration, the amount demanded by the plan becomes "due and owing" on the schedule it demanded. *Id.* § 1401(b)(1). Finally, the plan has six years to sue the employer for any missed payments. *Id.* § 1451(a), (f); *see also Bay Area Laundry*, 522 U.S. at 195.

The last provision at issue here is the MPPAA's control group rule. When the statute says "employer," it refers both to a contributing trade or business and to all other "trades or businesses . . . under common control." 29 U.S.C. § 1301(b)(1). The control group rule means that a BCI employer has withdrawn from a pension plan if one member of a control group ceases contributing to the plan and then it or a *different* member resumes covered work. *Ceco Concrete Constr., LLC v. Centennial State Carpenters Pension Tr.*, 821 F.3d

5

1250, 1258–59 (10th Cir. 2016). And it means that, when the plan sues to collect withdrawal liability, all members of the control group are jointly and severally liable. *Id.* at 1259–60; *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 120 (4th Cir. 1991).

B.

This detailed statutory scheme reveals several principles important to the resolution of our case. First, the scheme's overriding purpose is ensuring that "if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it." *Nachman Corp.*, 446 U.S. at 375. Consistent with this purpose, we have long described ERISA and the MPPAA as "remedial statutes" that "should be liberally construed in favor of protecting the participants in employee benefit plans." *Teamsters Joint Council No. 83*, 947 F.2d at 123.

Second, the method by which the MPPAA protects the participants in employee benefit plans is requiring each employer to cover its "fair share" of a multiemployer plan's future vested benefits. *Milwaukee Brewery Workers*, 513 U.S. at 417. The withdrawal liability mechanism and the control group rule work together to prevent "free riders" from making promises and then refusing to pay. *J. Supor & Son Trucking & Rigging Co. v. Trucking Emps. of N. Jersey Welfare Fund*, 30 F.4th 179, 180 (3d Cir. 2022).

Third, the MPPAA places responsibility for preventing free rider behavior squarely on the pension plan's shoulders. It is the pension plan that must "determine the amount of the employer's withdrawal liability," "notify the employer," and then "collect" it, 29

6

U.S.C. § 1382, and it is the pension plan that may choose to accelerate payments or stick to a monthly schedule, *id.* § 1399(c)(5). Plus, the pension plan need only send a notice and demand as quickly as is "practicable." *Id.* § 1399(b)(1). These features of the MPPAA "bespeak[] a deliberate legislative choice to afford some flexibility" in when and how a pension plan assesses withdrawal liability. *Bay Area Laundry*, 522 U.S. at 205.

Lastly, the MPPAA minimizes the disruption pension plans must face from the task of assessing withdrawal liability. By imposing detailed dispute resolution procedures, including arbitration, the law "limit[s] dispute-resolution costs and preserv[es] plans' assets" rather than inviting prolonged litigation. *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. BES Servs., Inc.*, 469 F.3d 369, 374 (4th Cir. 2006).

## II.

Against the backdrop of the statutory scheme, we now describe the dispute at hand.

The International Painters and Allied Trades Industry Pension Fund is a multiemployer pension plan regulated by ERISA and the MPPAA. One of its contributing businesses used to be Florida Glass of Tampa Bay. Florida Glass, like most of International Painters' contributing businesses, operated in the building and construction industry.

At some point in 2015, Florida Glass ceased having an obligation to contribute to International Painters because it stopped performing work that was covered by the plan's collective bargaining agreement. Then, in 2016, Florida Glass filed for Chapter 11 bankruptcy, and in 2017 its Chapter 11 reorganization proceedings were converted into Chapter 7 liquidation proceedings. The company closed up shop.

On November 10, 2016, International Painters' lawyer submitted a proof of claim for withdrawal liability in Florida Glass's Chapter 11 proceedings. Doing so was his "standard practice" when one of the plan's contributing employers filed for bankruptcy. J.A. 45. But because International Painters had not apparently determined whether Florida Glass had withdrawn from the plan—a determination that would require investigating whether Florida Glass or another member of its control group had recently resumed construction work—the lawyer labeled the proof of claim "[c]ontingent." J.A. 100.

The contingent proof of claim was not a model of clarity. Although the bankruptcy form said the claim was for $1,577,168, an attached document offered two "[c]hoices for payment": an interest-free "immediate payment" amount of $1,577,168 "OR" a series of nineteen monthly interest-bearing payments that totaled $1,627,538. J.A. 99–104. Neither the nature of the contingency nor the conflicting amounts were explained. Nevertheless, no one objected to the proof of claim, so it was deemed "allowed" by operation of bankruptcy law and the Chapter 7 Trustee proceeded to distribute $48,349 from the bankruptcy estate to International Painters. J.A. 50–51.

In the period that followed, International Painters auto-generated a list at the start of each year that identified which BCI businesses had not contributed to the plan during the preceding five years. In 2021, Florida Glass appeared on the list, so the plan began investigating. In 2022, the plan's trustees determined that Florida Glass and its control group had withdrawn in 2015 and voted to assess withdrawal liability of $1,577,168 on them. The trustees promptly sent out a notice and demand letter.

8

Florida Glass and its control group contested the notice and demand in an initial request for review. But they did not seek arbitration within the 180 days that followed, which the MPPAA would have allowed them. Instead, they asked for arbitration 281 days later—a date no one now contests was well outside the statutory window.

This suit, filed on January 9, 2023, is International Painters' attempt to collect on the 2022 notice and demand it sent to Florida Glass and its control group.

Things in the district court came to a head at summary judgment. By that point, the defendants did not contest the fact and amount of their withdrawal liability nor seek to defend their belated attempt at arbitration. Instead, their entire case rested on the statute of limitations. They argued that the pension plan's contingent proof of claim in Florida Glass's bankruptcy was itself a notice and demand under 29 U.S.C. § 1399(b)(1) and an acceleration under 29 U.S.C. § 1399(c)(5), meaning the entire withdrawal liability bill came due on November 10, 2016. When the defendants did not immediately pay, the six-year statute of limitations began running, eventually expiring on November 10, 2022. The result: this suit, filed on January 9, 2023, was untimely.

The district court rejected the defendants' statute of limitations defense in two alternate holdings. First, the court held that the 2016 proof of claim was neither a notice and demand nor an acceleration. The statute of limitations thus did not begin running until International Painters sent a notice and demand in 2022, rendering this suit timely. Alternatively, the district court held that even if the 2016 proof of claim *was* a notice, demand, and acceleration, the defendants had waived their ability to argue as much in court

9

because they had failed to initiate arbitration. As a result, they could not establish the predicate facts necessary to make out a statute of limitations defense.

Given that the defendants' sole argument was their statute of limitations defense, its rejection by the district court meant there was nothing left to decide. The court proceeded to enter summary judgment in favor of International Painters and ordered the defendants to pay the withdrawal liability they owed (minus the $48,349 International Painters had already recovered via bankruptcy) plus interest, liquidated damages, attorney's fees, and costs. This appeal followed.

## III.

Because this appeal comes to us at the summary judgment stage, we review the district court's decision de novo. *English v. Clarke*, 90 F.4th 636, 645 (4th Cir. 2024). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## IV.

This dispute presents two important questions for our circuit, both of which concern what happens when a multiemployer pension plan submits a proof of claim for withdrawal liability in the bankruptcy of a contributing employer. First, does the proof of claim operate as a notice and demand under 29 U.S.C. § 1399(b)(1)? Second, does it operate as an acceleration under 29 U.S.C. § 1399(c)(5)?

The answer to both questions may in some cases be "yes." A proof of claim that clearly satisfies the provisions of the MPPAA should be given operative effect under that statute. In this case, however, the answer is "no." Because the 2016 proof of claim

10

submitted by International Painters in Florida Glass's bankruptcy did not clearly satisfy the MPPAA's notice, demand, and acceleration provisions, the district court correctly held that it was nothing more than a proof of claim.

For that reason, the proof of claim did not trigger the MPPAA's six-year statute of limitations, and this suit is timely. The defendants, having presented no arguments other than the time bar, must lose the suit.

A.

We address the notice and demand question first. The answer begins, "as always," with the text of the relevant statutes. *Permanent Mission of India to the U.N. v. City of New York.*, 551 U.S. 193, 197 (2007). The MPPAA's succinct notice and demand provision provides:

> As soon as practicable after an employer's complete or partial withdrawal, the plan sponsor shall—
>> (A) notify the employer of—
>>> (i) the amount of the liability, and
>>> (ii) the schedule for liability payments, and
>> (B) demand payment in accordance with the schedule.

29 U.S.C. § 1399(b)(1).

At the same time, the Bankruptcy Code permits a creditor to file "a proof of claim." 11 U.S.C. § 501(a). The Code defines "claim" as a "right to payment," including one that is "contingent." *Id.* § 101(5). And the Federal Rules of Bankruptcy Procedure require that every proof of claim "substantially conform to Form 410," Fed. R. Bankr. P. 3001(a), which asks the creditor to identify the amount sought and the "basis of the claim" and to "[a]ttach . . . any documents that support the claim," Bankr. Form 410.

There is no inherent conflict between these provisions. A document that asserts a pension plan's "right to payment" of withdrawal liability, paired with other supporting documents and submitted "[a]s soon as practicable after an employer's . . . withdrawal," may well serve to "notify" the employer of its liability and "demand payment" accordingly. When it does, it is both a proof of claim under the Bankruptcy Code and a notice and demand under the MPPAA. *See, e.g.*, *Central States, Se. & Sw. Areas Pension Fund v. Koder*, 969 F.2d 451, 453 (7th Cir. 1992).

There are contexts, however, in which the provisions do not fit together so neatly. Our colleagues on the Seventh Circuit have pointed out, for example, that a proof of claim submitted in a Chapter 7 bankruptcy does not "notify" the debtor of anything if the Chapter 7 Trustee is the only one who sees it. *Chi. Truck Drivers v. El Paso Co.*, 525 F.3d 591, 598–99 (7th Cir. 2008). Our colleagues on the Third Circuit have similarly expressed uncertainty about whether a proof of claim submitted to a Chapter 11 claims agent in fact "notif[ies]" the debtor. *Steelworkers Pension Tr. v. Renco Grp., Inc.*, 694 F. App'x 69, 72, 74 (3d Cir. 2017).

The building and construction industry is another context in which the MPPAA and the bankruptcy laws are an imperfect fit. Many courts have held (although we express no view here on the proposition) that claims for withdrawal liability against a debtor are discharged upon confirmation of its Chapter 11 bankruptcy plan. *See In re CD Realty Partners*, 205 B.R. 651, 659–60 & n.10 (Bankr. D. Mass. 1997) (collecting cases). When a contributing business enters Chapter 11, then, the pension plan must either submit a proof of claim or "take the risk" of losing its right to collect pre-bankruptcy withdrawal liability

12

altogether. *In re Manhattan Jeep Chrysler Dodge, Inc.*, 599 B.R. 247, 253 (Bankr. S.D.N.Y. 2019). In the building and construction industry, where it takes time and effort to determine whether an employer has in fact withdrawn, the best a plan may be able to do on short notice is label its claim "contingent" and investigate later. In such a circumstance, a contingent proof of claim is an effort by the plan "to ensure that its rights [are] protected," not an effort to serve a formal notice and demand on the employer and start the dispute resolution clock. *Id.*

The defendants urge us to ignore this complexity and hold that every proof of claim operates as a notice and demand as a matter of law. But the notice issues raised by the Third and Seventh Circuits provide good reason to reject the defendants' rule, and the unique challenge facing pension plans in the building and construction industry does, too.

The defendants' rule would seriously undermine the optionality the MPPAA was designed to provide pension plans. As the Supreme Court has noted, the statute's structure—and its "as soon as practicable" language in particular—"bespeaks a deliberate legislative choice to afford some flexibility" in when and how a plan assesses withdrawal liability. *Bay Area Laundry*, 522 U.S. at 205. The law purposely "place[s] the running of the statute of limitations in the control of the fund." *Allied Painting & Decorating, Inc. v. Int'l Painters & Allied Trades Indus. Pension Fund*, 107 F.4th 190, 196 (3d Cir. 2024). Forcing a pension plan's protective, contingent filing against a BCI employer to operate as a notice and demand would turn this concept on its head by handing the stopwatch to the bankrupt employer.

13

The defendants' rule would also constrain the ability of pension plans to recover withdrawal liability from BCI employers at all. When a BCI business declares bankruptcy, the industry-specific rules in 29 U.S.C. § 1383(b)(2) mean that no one may know for five more years whether it has withdrawn from its pension plan. If the five-year period to identify a withdrawal began running at the same time as the six-year statute of limitations, the plan could find itself with one year or less to investigate and sue. That state of affairs would imperil, rather than "safeguard," "the solvency of private pension plans." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 228 (1986).

We think the better rule—the rule that leaves the stopwatch in the hands of the pension plan and provides it the flexibility to protect its assets, as Congress directed—is that a proof of claim operates as a notice and demand only when it clearly satisfies the MPPAA's requirements. It must clearly "notify the employer" of withdrawal liability, "demand payment," and be submitted "[a]s soon as practicable after" the employer's withdrawal. 29 U.S.C. § 1399(b)(1). Ambiguity should be resolved by concluding that the proof of claim is not a notice and demand.

We are confident that pension plans know how to draft a clear notice and demand when they want to. International Painters' 2022 notice and demand letter in this case is a good example. The letter was addressed directly to Florida Glass's control group. Its first sentence stated that the plan's trustees "hereby make demand for payment of withdrawal liability." J.A. 134. The next sentence explained that the trustees had "determined" that the recipients "had a complete withdrawal" in 2015. *Id.* The final paragraph, titled "Your Legal Rights," instructed the recipients about their statutory right to request review within 90

14

days. J.A. 136. The letter left no room to question that it was a notice and demand under the MPPAA.

International Painters' 2016 proof of claim, by contrast, raised several questions. It did not use the word "demand." It did not mention the MPPAA's dispute resolution procedures. It requested one amount of money "OR" another, different amount without effective explanation. J.A. 102. And although it identified December 31, 2015 as Florida Glass and its control group's "Withdrawal Date," *id.*, it also identified the "basis of the claim" as "[c]ontingent." J.A. 100. Because a demand for withdrawal liability levied after an employer's certain withdrawal from a pension plan would not be contingent, the "contingent" label suggested by definition that International Painters had not yet determined whether the defendants had withdrawn.

While a notice and demand need not contain a magic set of words, this panoply of ambiguities—and the "contingent" label in particular—makes it impossible for us to say that the proof of claim here clearly "demand[ed] payment" of withdrawal liability "after" Florida Glass and its control group's withdrawal from the plan. 29 U.S.C. § 1399(b)(1).

The defendants' fallback argument is that the proof of claim was a notice and demand because International Painters accepted a $48,349 distribution from the bankruptcy estate. We agree that this fact is unhelpful to International Painters. But the Bankruptcy Code permits a party in interest to object to a proof of claim, 11 U.S.C. § 502(a), which International Painters could reasonably have expected the defendants to do in response to its ambiguous contingent filing. Their failure to object cannot after the fact transform the filing into a clear notice and demand. The district court appropriately

15

handled the distribution by subtracting it from International Painters' award in this suit, thereby preventing a double recovery.

## B.

Our answer to the acceleration question follows necessarily from our answer to the notice and demand question. The MPPAA's acceleration provision provides that, in certain circumstances, "a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability . . . ." 29 U.S.C. § 1399(c)(5). But if a pension plan has not sent a notice and demand, there is no "outstanding amount" of withdrawal liability due and thus no amount to accelerate. Because we held above that International Painters' 2016 proof of claim was not a notice and demand, we are obligated to hold that it was not an acceleration either.

## V.

Finally we note the district court's alternate ruling: that even if International Painters' 2016 proof of claim *was* a notice, demand, and acceleration, the defendants waived their arguments to that end by failing to arbitrate them.

The district court was correct to observe that the MPPAA's arbitration mandate sweeps broadly. The statute requires arbitration of "[a]ny dispute between an employer and . . . a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title." *Id.* § 1401(a)(1). Those sections, in turn, cover almost the entire who, what, when, where, and how of withdrawal liability. They even incorporate by reference aspects of withdrawal liability contained in other sections. *BES Servs.*, 469 F.3d at 373 (observing that § 1381 incorporates § 1405). "[N]ormally," then, a party's failure to

16

arbitrate an argument related to withdrawal liability means that the argument is "waived" when the party later tries to assert it in court. *Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 446 (4th Cir. 2015).

This case, however, presents more of a challenge than most. On the one hand, the kind of argument presented below—an argument about the sufficiency of notice and demand—would seem to fall squarely within the MPPAA's expansive arbitration mandate, as the First and Third Circuits have held. *Giroux Bros. Transp., Inc. v. New England Teamsters & Trucking Indus. Pension Fund*, 73 F.3d 1, 3–4 (1st Cir. 1996); *Steelworkers Pension Tr.*, 694 F. App'x at 74. On the other hand, a party that truly did not receive notice, and thus "had absolutely no reason to believe" there was anything to arbitrate, cannot reasonably be held responsible for failing to arbitrate. *Cent. States, Se. & Sw. Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1373 (7th Cir. 1992). While the defendants here have a colorable argument that they had nothing to arbitrate in 2016, we cannot say the same about 2022, when they received an obvious notice and demand and *did* try to arbitrate it 101 days too late. When a party has every reason to arbitrate but fails to do so within the deadline, it receives "but a self-inflicted wound." *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 129 (3d Cir. 1986).

In any event, we need not solve this challenge today. Since we held above that International Painters' 2016 proof of claim was not a notice, demand, or acceleration, this suit is timely. And since the defendants presented no argument other than timeliness, there is nothing more to address. Having fully resolved the case on the basis of the notice and demand question, we see no need to reach the district court's alternative ruling.

17

VI.

The ultimate effect of any ERISA decision is felt most personally by the workers whose retirement plans are on the line. In this case, those workers are the 140,000 painters, drywall finishers, glaziers, and other tradesmen and women who belong to International Painters. They show up to the job site day in and day out believing that, eventually, their hard work will be rewarded with the reliable pensions they have been promised. People often plan their lives around pensions, and when their expectations are dashed, the impact can be shattering.

The scheme Congress established to protect these workers' expectations is—like all laws—imperfect. The MPPAA does not contain an instruction manual for how it should operate in the context of a contributing employer's bankruptcy. But manual or no manual, the defendants in this suit may not use Florida Glass's bankruptcy as a shield to avoid their obligations. They have always known that their withdrawal from International Painters would leave them on the hook for a large bill, and now that bill has come due.

We affirm the district court's grant of summary judgment to International Painters on the basis of its holding that the 2016 proof of claim was neither a notice and demand under 29 U.S.C. § 1399(b)(1) nor an acceleration under 29 U.S.C. § 1399(c)(5). We also affirm its order granting withdrawal liability, interest, liquidated damages, attorney's fees, and costs to International Painters. Finally, we direct the district court to grant International Painters any remaining financial relief to which it is entitled under 29 U.S.C. § 1132(g)(2) as a result of this appeal. *See, e.g.*, *Bldg. Serv. Loc. 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1404 (6th Cir. 1995) (attorney's fees).

18

*AFFIRMED*